**Michael Rand, Administrator of the**
**Estate of Wendy Lawrence**

        v.                                    Case No. 14-cv-570-PB
                                             Opinion No. 2017 DNH 177
**Chad Lavoie, in both his individual**
**and official capacities**


### MEMORANDUM AND ORDER

Michael Rand, the administrator of Wendy Lawrence's estate,
alleges that New Hampshire State Police Officer Chad Lavoie shot
and killed Lawrence in violation of the Fourth Amendment and New
Hampshire law.  With discovery closed, Lavoie now moves for
summary judgment, claiming that he is entitled to qualified
immunity.  Because Lavoie's argument depends on facts that
remain in genuine dispute, I deny his request for summary
judgment.


## I.  BACKGROUND

Except for the moments immediately preceding the shooting,
the events leading up to the interaction between Lawrence and
Lavoie are largely undisputed.  On September 30, 2013, New
Hampshire State Police Officer Kevin LeBlanc noticed a maroon

Monte Carlo drifting between lanes on Interstate 89 in New Hampshire.  See Doc. No. 60-2 at 1.  Lawrence was the driver. Id.  Suspecting a possible instance of driving while intoxicated, LeBlanc attempted to pull over the Monte Carlo. See id.  Although Lawrence initially failed to respond, she eventually pulled to the side of the road and Officer Leblanc approached her vehicle.  See id.  After receiving Lawrence's identification card and registration, LeBlanc ran her information and found that she was a "habitual offender" with a suspended license.  See id. at 1–2.  Before he could view more of her record, Lawrence drove away at approximately 80–90 mph. Id. at 2.

LeBlanc pursued Lawrence, but terminated his pursuit shortly after reporting her information to dispatch.  See id. at 2.  Continuing along the interstate, however, LeBlanc came across Lawrence again.  See id.  This time, he saw that she had crashed: she was sideways in the left lane of the highway with other cars pulled off to the right.  Id.  When LeBlanc drew closer, Lawrence drove away, nearly hitting a man standing by the side of her car.  See id.  LeBlanc reinitiated his pursuit and was joined by several other police cruisers.  See id.  Some officers attempted to deploy spike strips to stop Lawrence but were unsuccessful.  Id.

While being pursued, Lawrence took an exit off of the interstate, heading toward Manchester.  See id.  At this point, Lieutenant Matthew Shapiro, who was not on the scene, ordered the officers to terminate the pursuit.  Id.; see Doc. No. 68-5 at 12 (saying "let her go").  The officers accordingly turned off their lights and sirens, but they continued following Lawrence through Manchester pursuant to Sergeant Bryan Trask's subsequent instruction to "play the area."  See Doc. No. 60-2 at 2.  After exiting the interstate, Lawrence stopped at stop signs, obeyed the speed limit, and otherwise committed no motor vehicle violations.  See Doc. No. 68-2 at 9-11.

As these events were unfolding, Lavoie heard over his radio that State Police officers were pursuing a vehicle on the interstate.  See Doc. No. 68-4 at 3.  Dispatch radioed for assistance, specifically mentioning Lavoie's call number, see Doc. No. 60-8 (recording of dispatch); Doc. No. 60-11 at 1, and he proceeded to drive toward the pursuit, see Doc. No. 62-6 at 6.  Before he encountered Lawrence, however, Lavoie heard Lt. Shapiro's and Sgt. Trask's orders, so he turned off his lights and siren and "played the area."  See Doc. No. 60-11 at 1; Doc. No. 68-4 at 5.  By the time he encountered Lawrence, Lavoie had learned that she was driving a maroon or "reddish" Monte Carlo, see id. at 9; had a suspended license, id.; had refused to stop, id. at 18; had been driving at 90 mph, id. at 19; and that spike

strips had been unsuccessfully deployed, see Doc. No. 60-11 at
1.

In Manchester, Lawrence eventually came to a stop sign at
the intersection of Dave Street and Kennard Road, with LeBlanc
and others still behind her.  See id. at 1.  The parties dispute
what happened next.  According to Lavoie, he pulled in front of
Lawrence as she was coming to the stop sign on Dave Street.  See
Doc. No. 60-11 at 1-2.  Lavoie then exited his cruiser and came
around its trunk, standing a short distance away from the back-
right bumper.  See id. at 2; Doc. No. 62-1.  At some point
during this time, Lawrence rammed the right side of Lavoie's
cruiser, see Doc. No. 68-4 at 44, and Lavoie began commanding
Lawrence to stop her vehicle and raised his firearm.  See Doc.
No. 60-11 at 2; Doc. No. 62-6 at 19-20.  Lt. Shapiro heard over
the radio around this time that Lawrence had rammed a cruiser,
and he instructed the officers again to "let her go."  Doc. No.
62-5 at 3.  Standing near his cruiser's back-right bumper,
Lavoie saw Lawrence back up and hit the State Police cruiser
behind her, then turn her steering wheel and move toward him in
an arc.  See Doc. No. 60-11 at 2.  In response, Lavoie
discharged his firearm until Lawrence's car stopped moving, Doc.
No. 68-6 at 10, firing a total of eleven shots in about three

seconds, killing Lawrence.  Doc. No. 60-10;[1] see Doc. No. 68-1 at 1, 3.  Lawrence's vehicle came to a stop approximately five feet from Lavoie's shooting position.  See Hearing on Motion for Summary Judgment held August 7, 2017.  Lavoie estimated that four to five seconds elapsed between exiting his cruiser and beginning to discharge his weapon.  See Doc. No. 68-4 at 69-70; Doc. No. 68-6 at 22.  His version of events is supported primarily by his own statements and LeBlanc's, the physical evidence, and the opinion of ballistics expert Lucien Haag, who asserted that Lawrence's vehicle moved toward Lavoie while he fired.  See Doc. No. 62 at 5-9; Doc. No. 85 at 2; Doc. No. 60-24 at 2-3.

Rand tells a very different story.  Per Rand, while Lawrence was stopped at the intersection, Lavoie pulled in front of her, scraping the right side of his cruiser against the front of Lawrence's vehicle.  See Doc. No. 68-1 at 19-20.  Lavoie then exited his cruiser and fired eleven shots through Lawrence's windshield.  See id. at 1, 3, 19.  According to Rand, Lawrence's vehicle did not move after the collision with Lavoie's cruiser. See id. at 20.  Because Lawrence did not survive, Rand relies

---

[1] For the purposes of summary judgment, Lavoie stipulates that he hit Lawrence's Monte Carlo as he pulled in front of it; that the Monte Carlo was stationary when he hit it; and that Lawrence did not make contact with the cruiser behind her, though she did back up in that direction.  Doc. No. 85 at 1.

principally on the opinion of collision reconstruction expert
Carl Lakowicz to support his version of events. See id. at 18–
20; Doc. No. 68-7 at 3. Lakowicz opined that only one collision
occurred in the relevant timeframe — Lavoie's cruiser hit
Lawrence's vehicle — and Lawrence's vehicle was stationary for
five seconds prior to that collision. See Doc. No. 68-21 at 3–
4. Lakowicz denies that Lawrence's vehicle was moving toward
Lavoie when he began firing. Id. at 7. Lakowicz also opines
that even if Lawrence's vehicle were moving towards Lavoie, it
was moving so slowly that he would have had up to 11.25 seconds
to safely step out of the way. See id. at 5.

Rand also relies on the expert opinion of criminologist
George Kirkham. See Doc. No. 68-1 at 10–13. Assuming that
Lawrence's vehicle moved towards Lavoie, Kirkham opined that no
"competent and properly trained officer" in Lavoie's position
would have reasonably perceived an imminent threat of serious
bodily harm or "believed that there was no alternative but to
use deadly force." Doc. No. 68-10 at 5. Kirkham concludes that
Lavoie could have safely stepped outside the path of Lawrence's
vehicle. See id. at 5-6. He also quotes the 2006 Model Policy
of the International Association of Chiefs of Police, which
provides that officers should step outside the path of moving
vehicles and only use firearms where "a person in the vehicle is

immediately threatening the officer or another person with deadly force by means other than the vehicle." Id. at 6.

## II.  STANDARD OF REVIEW

I may grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  "If a nonmovant bears the ultimate burden of proof on a given issue, she must present 'definite, competent evidence' sufficient to establish the elements of her claim in order to survive a motion for summary judgment." Pina v. Children's Place, 740 F.3d 785, 795-96 (1st Cir. 2014) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). I must "draw all reasonable inferences from the record in the light most favorable to the nonmoving party, disregarding any 'conclusory allegations, improbable inferences, and unsupported speculation.'" McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014) (quoting Alicea v. Machete Music, 744 F.3d 773, 778 (1st Cir. 2014)).  And where the moving party raises a qualified immunity defense, the nonmoving party has the burden of showing that qualified immunity does not apply. See Mitchell v. Miller, 790 F.3d 73, 76-77 (1st Cir. 2015) (second prong); cf. Lopera v. Town Of Coventry, 640 F.3d 388, 395-96 (1st Cir. 2011) (first prong); Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011).

### III. <u>ANALYSIS</u>

Rand brings two claims against Lavoie.  First, Rand seeks to recover under 42 U.S.C. § 1983 for the use of excessive force in violation of the Fourth Amendment.[2]  Doc. No. 19 at 14.  Next, Rand seeks damages for wrongful death under section 556:12 of the New Hampshire Revised Statutes.  <u>Id.</u> at 15.  I consider each claim in turn.

### A.    <u>Section 1983 Claim</u>

Lavoie asserts that he is entitled to summary judgment on Rand's § 1983 claim because qualified immunity shields him from suit.  The doctrine of qualified immunity reflects a careful balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).  It "ensure[s] that before they are subjected to suit, officers are on notice their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Saucier v. Katz, 533 U.S. 194, 206 (2001)).  In short, qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

---

[2] Rand also asserts violations of the Fifth and Fourteenth Amendments.  Because he does not assert distinct claims based on these provisions, I do not address them in this Memorandum and Order.

1. <u>Legal Standard</u>

To overcome Lavoie's qualified immunity defense, Rand must show that Lavoie "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." <u>See</u> Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). The First Circuit has explained that there are two aspects to this inquiry: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Stamps v. Town of Framingham, 813 F.3d 27, 34 (1st Cir. 2016) (quoting Mlodzinski v. Lewis, 648 F.3d 24, 32 (1st Cir. 2011)).

A Fourth Amendment excessive force claim requires proof that "the defendant officer employed force that was unreasonable under the circumstances." McGrath, 757 F.3d at 25 (quoting Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir. 2012)). In general, an officer may not use deadly force defensively or to prevent escape unless a "reasonable officer [in the same circumstances] would believe that [an individual] posed a 'threat of serious physical harm either to the officer or others.'" See Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 23 (1st Cir. 2005) (quoting Tennessee v. Garner, 471 U.S. 1, 12 (1985)). But general rules only go so far. In

assessing the reasonableness of an officer's conduct, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). They must take into account the "totality of circumstances," Garner, 471 at 9, and "slosh [their] way through the factbound morass of 'reasonableness,'" Scott v. Harris, 550 U.S. 372, 383 (2007).

The Fourth Amendment's reasonableness test is objective: it focuses on how a "reasonable officer on the scene" would act, rather than an officer's actual state of mind. See McGrath, 757 F.3d at 25 (quoting Kenney, 700 F.3d at 609)). Crucially, courts must avoid analyzing an officer's conduct "with the 20/20 vision of hindsight" and should be mindful that "police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

In determining whether a constitutional right is clearly established, "[w]e ask (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he was doing violated the right, and (b) whether in the particular factual context of

the case, a reasonable officer would have understood that his conduct violated the right." Stamps, 813 F.3d at 34 (quoting Mlodzinski, 648 F.3d at 32–33). Although Rand need not provide a "case directly on point" to pierce qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix, 136 S. Ct. at 308 (quoting al-Kidd, 563 U.S. at 741). This requires either "controlling authority or a robust consensus of cases of persuasive authority." Plumhoff, 134 S. Ct. at 2023 (citation and internal quotation marks omitted) (dictum).

Furthermore, the Supreme Court has stressed that courts cannot define a clearly established right "at a high level of generality," but instead must determine "whether the violative nature of particular conduct is clearly established." Mullenix, 136 S. Ct. at 308 (citation omitted); see also White v. Pauly, 137 S. Ct. 548, 552 (2017). In other words, an act's "unlawfulness must be apparent." White, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). A right described "at a high level of generality" will suffice only in "an obvious case." Id. at 552 (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (per curiam)).

2.  Application

Rand contends that Lavoie is not entitled to qualified immunity for two independent reasons. First, Rand claims he has

produced sufficient evidence to create a genuine dispute as to whether Lawrence's vehicle moved at all after the collision with Lavoie. See Doc. No. 68-7 at 3–4. Assuming the vehicle did not move, he argues that Lavoie's actions violated the Fourth Amendment and clearly established law. Second, even if the vehicle did move toward Lavoie before he began firing, Rand maintains that a reasonable jury could conclude that, given how much time Lavoie had to react, he violated the Fourth Amendment and clearly established law by choosing to use deadly force instead of stepping safely behind his cruiser. See id. at 4; Doc. No. 96 at 2. I agree that summary judgment is inappropriate under either theory.

### a.    First Theory — Lawrence's Vehicle Did Not Move

Rand argues that he has presented enough evidence to create a genuine dispute as to whether Lawrence's vehicle remained stationary after Lavoie collided with it. Lavoie retorts that Rand has not offered adequate evidence to support his version of events. See Doc. No. 85 at 1–2. I disagree. Rand has done enough to allow a reasonable jury to accept his account. As Lavoie concedes that qualified immunity would not apply if Lawrence's vehicle did not move, Hearing on Motion for Summary Judgment held August 7, 2017,[3] a genuine dispute of material fact

---

[3] This concession reflects the applicable law: it was clearly established as of 2013 that an officer confronted with a

precludes summary judgment.  See Thompson v. Coca-Cola Co., 522 F.3d 168, 175 (1st Cir. 2008) (defining "genuine" and "material").

Rand relies principally on the opinion of collision reconstruction expert Carl Lakowicz for support.[4]  Lakowicz opined that Lawrence's vehicle did not move for five seconds prior to Lavoie colliding with it.  Doc. No. 68-21 at 3. Lakowicz adequately explained his conclusion with reference to specific facts.  See id.; Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993) ("[A]n expert affidavit . . . must at least include the factual basis and the process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment.").  Based on Lakowicz's opinion, and the undisputed fact that Lavoie shot Lawrence, a reasonable jury could conclude that Lavoie's version of events is incorrect and

---

stationary vehicle and a driver who had not exhibited dangerous behavior would not be entitled to use deadly force.  See, e.g., Morton v. Kirkwood, 707 F.3d 1276, 1281-82 (11th Cir. 2013); Kirby v. Duva, 530 F.3d 475, 482-83 (6th Cir. 2008); Adams v. Speers, 473 F.3d 989, 993 (9th Cir. 2007); Lytle v. Bexar County, 560 F.3d 404, 413 (5th Cir. 2009); see also Garner, 471 U.S. at 12-13.

[4] Rand is not required to produce his own eye witness.  Indeed, in cases like this where the plaintiff's best (and perhaps only) eyewitness has died, courts should be especially attentive to expert opinion and physical evidence.  See Flythe v. District of Columbia, 791 F.3d 13, 19 (D.C. Cir. 2015); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994).

that Lawrence did not move her vehicle at all from the time of collision through the shooting.

The eyewitness accounts supporting Lavoie's version of events do not compel a different conclusion, because Rand has submitted enough contradictory evidence to allow a reasonable jury to discredit them. In particular, Lakowicz supportably opined that only one collision occurred in the relevant timeframe, when Lavoie's cruiser hit Lawrence's vehicle. See Doc. No. 68-21 at 3-4.[5] This conflicts with the eyewitnesses, who each claim Lawrence initiated two collisions. See Doc. No. 62-4 at 7, 12, 14-15, 32 (LeBlanc deposition); Doc. No. 68-4 at 44 (Lavoie Deposition); Doc. No. 68-12 at 9, 19, 22, 30 (Officer William Tibbits deposition). A jury could reasonably discount the eyewitnesses' testimonies because of their significant inconsistency with Lakowicz's expert opinion. See Cruz v. City of Anaheim, 765 F.3d 1076, 1079-80 (9th Cir. 2014) (denying summary judgment where reasonable jury could discredit officers' statements on basis of circumstantial evidence); cf. Nunes v. Massachusetts Dep't of Correction, 766 F.3d 136, 142 (1st Cir. 2014) (party may rely on evidence impacting credibility to create genuine dispute of fact).

_____

[5] Collision reconstruction expert Bruce McNally, retained by Lavoie, opined that that Lawrence's vehicle collided with LeBlanc's cruiser. See Doc. No. 60-19 at 1-2. Disagreements among experts are for a jury to resolve.

Likewise, a jury would not have to accept the opinion of ballistics expert Lucien Haag that Lawrence's vehicle moved towards Lavoie while Lavoie fired.  See Doc. No. 85 at 2; Doc. No. 60-24 at 2–3.  Haag reasoned that the bullet holes in Lawrence's windshield demonstrate that Lawrence's vehicle was in motion when Lavoie fired, assuming Lavoie maintained a stationary shooting position.  See Doc. No. 60-24 at 2–3.  Haag grounds his assumption about Lavoie's shooting position in Lavoie's own words, not on any physical evidence.  See id. at 3.  As explained above, however, a jury could reasonably reject Lavoie's testimony and correspondingly reject the assumption underlying Haag's opinion.[6]

Finally, although there are some instances in which a party's version of events is "so utterly discredited" by video evidence that a suit cannot proceed to trial, see Scott, 550 U.S. at 380–81, that is not the case here.  While a dash-cam video taken by one of the cruisers following Lawrence exists, it does not capture the initial collision between Lavoie and Lawrence, and both remain out-of-frame through the shooting.

---

[6] Haag also supports his opinion with evidence concerning bullet holes in the steering wheel of Lawrence's vehicle.  See Doc. No. 60-24 at 2.  According to Haag, the steering wheel must have been turned to a particular position to sustain the damage it did.  See id. at 3–4.  As Lawrence points out, see Doc. No. 68-7 at 4, it is a matter of commonsense that a turned steering wheel does not necessarily imply a moving vehicle.

Accordingly, the video evidence of record does not conclusively establish that Lawrence moved her vehicle after colliding with Lavoie's cruiser.[7]

Although a reasonable jury might reject Lavoie's version of events, it is worth emphasizing that Lavoie has marshalled substantial evidence to support his account of the shooting, and a jury could very well conclude that his account is true. Still, my role at the summary-judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Viewing the record as I must, Rand has produced sufficient evidence to avoid summary judgment.

### b. Second Theory — Lawrence's Vehicle Did Move

Although Rand is independently entitled to a trial by virtue of his first factual theory — that Lawrence's vehicle did not move after the collision with Lavoie's cruiser — Rand maintains that trial is appropriate even if Lawrence's vehicle moved towards Lavoie before he began firing. See Doc. No. 96 at 2; Doc. No. 68-1 at 20. Rand replies that he committed no

---

[7] To the extent Lawrence's position when last seen in the dash-cam video is inconsistent with her position after the shooting, see Doc. No. 60-23 at 3-4, there would remain a genuine dispute of fact. The video would show, at most, that Lawrence moved after leaving the frame of the dash-cam video, not that she was moving when Lavoie fired.

constitutional violation and, in any event, contravened no clearly established law.  Again, I disagree.  Viewing Lavoie's version of events in the light most favorable to Rand, a jury could reasonably conclude that Lavoie's actions violated a clearly established Fourth Amendment right even if Lawrence's vehicle was moving toward him when he fired the fatal shots.

### 1.   Constitutional Violation

As explained above, an officer generally may not use deadly force defensively or to prevent escape unless a "reasonable officer [in the same circumstances] would believe that [an individual] posed a 'threat of serious physical harm either to the officer or others.'"  See Young, 404 F.3d at 23 (citation omitted).  Relying on Lavoie's version of events — viewed in the light most favorable to Rand — a jury could determine that a reasonable officer in Lavoie's position would not have perceived Lawrence as presenting a "threat of serious harm" to Lavoie. Cf. id. at 22-23 (noting that, where officers mistakenly used deadly force against an off-duty officer, jury could have found officers' misidentification or haste unreasonable).

After exiting his cruiser, Lavoie had a significant amount of time to identify any risk that Lawrence might have posed and largely eliminate that risk by moving behind his cruiser.  At least four to five seconds passed between Lavoie leaving the

cruiser and his first shot.[8]  See Doc. No. 68-4 at 69–70; Doc.

No. 68-6 at 22.  A further three seconds passed while Lavoie was

firing.  Doc. No. 60-10.  And once Lavoie stopped firing,

Lawrence's vehicle was still roughly five feet away from him.

Thus, based solely on Lavoie's account, it could have taken

Lawrence's vehicle eight or more seconds to reach Lavoie after

he left the cover of his cruiser.

Expert opinion buttresses Rand's argument.  George Kirkham

determined that no "competent and properly trained officer"

could have reasonably seen Lawrence as posing an imminent threat

of serious bodily harm or "believed that there was no

alternative but to use deadly force."  Doc. No. 68-10 at 5; see

also Cowan ex rel. Estate of Cooper v. Breen, 352 F.3d 756, 763-

64 (2d Cir. 2003) (taking into account expert opinion on how a

"reasonably competent officer" would react to oncoming vehicle).

Lavoie should have stepped out of the way.  See Doc. No. 68-10

at 5-6.  Carl Lakowicz added that "at the speed [Lawrence] was

traveling, it would have taken approximately 11.25 seconds for

[her] car to reach Trooper Lavoie's shooting position."  Doc.

No. 68-21 at 5.[9]

_____

[8] As previously mentioned, Lavoie concedes for purposes of
summary judgment that Lawrence did not ram his cruiser or back
into LeBlanc's.  Doc. No. 85 at 1.
[9] In a motion to strike, Lavoie attacks the quoted opinion as
conclusory.  Doc. No. 87 at 9-10.  Lavoie is correct that
conclusory expert opinions are insufficient to resist summary

Given this evidence, a reasonable jury could surmise that a reasonable officer in Lavoie's position would have realized he had ample time to step behind his cruiser and that Lawrence therefore did not pose a threat of serious harm to him.  See Abraham v. Raso, 183 F.3d 279, 294 (3d Cir. 1999) (holding in the alternative that, where officer used deadly force against approaching driver, officer's opportunity to get out of way and uncertainty as to speed of vehicle, inter alia, created jury question as to reasonableness of officer's conduct); Acosta v. City & Cty. of San Francisco, 83 F.3d 1143, 1146 (9th Cir. 1996), as amended (June 18, 1996) ("On the basis of the evidence presented at trial, the jury could have reasonably concluded that a reasonable officer . . . would have recognized that he could avoid being injured when the car moved slowly, by simply stepping to the side." (footnotes omitted)); Cowan, 352 F.3d at 763-64 (holding officer's use of deadly force against driver would be unreasonable if, inter alia, driver's vehicle was moving slowly and officer was not in vehicle's path, or if officer could have gotten out of the way).

---

judgment, see Hayes, 8 F.3d at 92, but, subject to reassessment during trial, I conclude that the explanation for the quoted opinion is minimally sufficient to support Rand's position.  In any event, the inclusion or exclusion of the opinion would not affect the present order, and Lavoie may renew his objection to Lakowicz's opinion prior to trial.

A jury could likewise conclude that a reasonable officer would not believe that Lawrence posed a threat to other officers on the scene or to the public.  Lavoie has not suggested that there was an officer positioned between himself and Lawrence's vehicle, and any officer behind Lavoie would have had at least as much time to avoid the vehicle as Lavoie did.  Moreover, an officer standing by the side of Lawrence's vehicle would not have been in significant danger.  See Cowan, 352 F.3d at 763–64; Sigley v. City of Parma Heights, 437 F.3d 527, 530–31, 536 (6th Cir. 2006).

As for potential danger to the public, a reasonable jury could conclude that none of the facts known by Lavoie suggested that Lawrence posed an imminent threat.  Lavoie knew, for instance, that Lawrence had a suspended license and had been speeding, see Doc. No. 68-4 at 9, 19, but that kind of conduct stands in stark contrast to the conduct typically justifying the use of deadly force against a fleeing suspect, see Scott, 550 U.S. at 379–80 ([f]leeing suspect "rac[ed] down narrow, two-lane roads in the dead of night at speeds that [were] shockingly fast[,] . . . swerve[d] around more than a dozen other cars, cross[ed] the double-yellow line, and force[d] cars traveling in both directions to their respective shoulders to avoid being hit"); Plumhoff, 134 S. Ct. at 2021–22 (similar).  Statements by LeBlanc and Lt. Shapiro also provide important context.  LeBlanc

20

noted that, once in Manchester, Lawrence stopped at stop signs, obeyed the speed limit, and otherwise committed no motor vehicle violations.  See Doc. No. 68-2 at 9–11.  And Lt. Shapiro instructed the officers to "let [Lawrence] go" when she exited the interstate and again when he heard that she had rammed a cruiser.  See Doc. No. 68-5 at 12; Doc. No. 62-5 at 3.  These orders demonstrate that Lt. Shapiro did not view Lawrence as a threat to the public.

Lavoie relies heavily on McGrath v. Tavares to show that he committed no constitutional violation.  See Doc. No. 62 at 11–14.  McGrath, however, is consistent with the denial of summary judgment in this case.  In McGrath, a suspected liquor store burglar led two officers on a car chase through a downtown area, "speeding" and "zigzagging" along the way.  See McGrath, 757 F.3d at 22–23.  The suspect eventually crashed into a stone wall, and the officers exited their cruisers after pulling up behind the suspect's vehicle.  See id. at 23.  Instead of obeying the officers' commands, the suspect reversed past their cruisers — hitting a cruiser in the process — and crashed into a telephone poll.  See id.  The suspect then drove toward one of the officers, prompting the officer to fire two shots at the vehicle.  Id.  As the suspect passed the officer, moving toward what the officer believed to be his colleague's position, the

officer fired two more shots.  Id. at 23, 28.  The First Circuit
found no constitutional violation.  Id. at 29.

Whereas the shooting officer in McGrath had to make a
"split-second judgment" about whether "to shoot or risk being
run over," id. at 28, a jury could find that Lavoie did not have
to make such a time-constrained decision.  Instead, it could
conclude — taking into account expert testimony with no apparent
analogue in McGrath — that Lavoie had sufficient time to react
to Lawrence's movement and avoid the use of deadly force.
Similarly, the shooting officer in McGrath had witnessed the
suspect's reckless driving and believed his colleague was in the
suspect's path.  See id. at 28–29.  In this case, Lavoie
witnessed no such reckless driving and could not have reasonably
believed that other officers were in significant danger.
Finally, the First Circuit stressed in McGrath that "the chase
was still ongoing when" deadly force was used.  Id. at 28.  In
contrast, Lt. Shapiro twice told officers to "let [Lawrence]
go."  See Doc. No. 68-5 at 12; Doc. No. 62-5 at 3.  Thus, a jury
could find that Lavoie's use of deadly force was not reasonable
as a means to protect himself, other officers, or the public.

I am mindful of the Supreme Court's instruction to adopt
"the perspective of a reasonable officer on the scene," and
avoid "the 20/20 vision of hindsight."  Graham, 490 U.S. at 396.
Adhering to that instruction, a reasonable jury could still

conclude that Lavoie was not unequivocally "forced to make [a] split-second" decision entitled to deference. McGrath, 757 F.3d at 26, 28; cf. Kirby v. Duva, 530 F.3d 475, 483 (6th Cir. 2008) (where officers "each had an adequate opportunity to realize before shooting that the [decedent's vehicle] had stopped moving and that no one was in its path," there was no need for "'split-second' decision") (citation omitted).  Thus, a jury could find his conduct objectively unreasonable.

## 2.   Clearly Established Right

For Rand's claim to survive on the second theory, it is not enough for Lavoie to have violated the Fourth Amendment. Qualified immunity attaches unless Lavoie "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." Mullenix, 136 S. Ct. at 308 (citation omitted).  Reviewing the relevant law, by September 2013, a "robust consensus of cases" had clearly established that an officer may not use deadly force to defend against a slowly approaching vehicle if it would have been clear to a reasonable officer in the defendant's position that the vehicle did not pose an imminent danger to any member of the public or another officer and the officer had sufficient opportunity to safely step outside its path.[10]  Accordingly, a

_____

[10] By straightforward implication, it was also clearly established that an officer may not use deadly force to defend

reasonable officer in Lavoie's position would have recognized
the unlawfulness of using deadly force in those circumstances.[11]

_____

other officers against a slowly approaching vehicle if they had
sufficient opportunity to step aside.  No officer in this
instance would have been in greater danger than Lavoie.

Furthermore, it was obvious under Garner, 471 U.S. at 12, that
an officer could not use deadly force to prevent the flight of
someone suspected merely of speeding and driving with a
suspended license.  Plumhoff, 134 S. Ct. at 2012, does not
compel a contrary conclusion.  In Plumhoff, the Supreme Court
noted that Brosseau v. Haugen, 543 U.S. 194 (2004) (per curiam),
"makes plain that as of February 21, 1999 . . . it was not
clearly established that it was unconstitutional to shoot a
fleeing driver to protect those whom his flight might endanger."
Plumhoff, 134 S. Ct. at 2023.  To pierce qualified immunity, the
Plumhoff Court continued, the plaintiff had to show that his
circumstances were materially different from those in Brousseau
or that a new rule had become established after 1999.  See id.;
see also McGrath, 757 F.3d at 30 (employing Plumhoff test).
Lawrence's conduct differs materially from the suspect's conduct
in Brosseau.  There, an officer shot a suspect fleeing in a
vehicle, believing that the suspect (1) had just been in a
violent fight, (2) had not relented when the officer broke the
vehicle's driver-side window and hit the suspect with the butt
of her gun, and (3) was driving toward occupied vehicles and
officers on foot.  Brousseau, 543 U.S. at 195-97.  None of these
circumstances are present here.  Moreover, Lt. Shapiro twice
instructed the officers to "let [Lawrence] go," see Doc. No. 68-
5 at 12; Doc. No. 62-5 at 3, and the evidence in this case could
be construed to support a conclusion that Lawrence was obeying
speed limits and traffic laws immediately prior to the shooting,
See Doc. No. 68-2 at 9-11.  Under this view of the evidence,
Lavoie would have had no reason to believe that Lawrence posed
an imminent risk to the general public if he had stepped aside
and let her pass rather than shooting her.

[11] Put another way, "[o]n the facts as a jury might find them to
be in this case . . . it was clear under existing law that"
Lavoie violated a constitutional right."  Stamps, 813 F.3d at
42; see also Morelli v. Webster, 552 F.3d 12, 25 (1st Cir. 2009)
(reversing grant of summary judgment where "a rational jury
could find . . . facts establishing that [officer's] use of
force was so objectively unreasonable and so plainly misguided

A number of Courts of Appeals have utilized this clearly established rule.  The Ninth Circuit held in <u>Acosta</u> that an officer who used deadly force against a slowly approaching vehicle could be liable for violating the Fourth Amendment where a reasonable officer "would have recognized that he could avoid being injured . . . by simply stepping to the side."  <u>See</u> 83 F.3d at 1146–47.  The Third Circuit held in the alternative in <u>Abraham</u> that uncertainties as to whether an officer could "get out of the way" of an oncoming car precluded summary judgment. <u>See</u> 183 F.3d at 294, 299.  Similarly, the Second Circuit held in the alternative that if an officer "safely could have gotten out of the way" of an oncoming car, then his use of deadly force would have violated the Fourth Amendment.  <u>See</u> Cowan, 352 F.3d at 763–64.  Last, the Seventh Circuit suggested in dicta that a vehicle does not pose a threat of serious bodily harm if an officer can avoid it.  <u>See</u> Estate of Starks v. Enyart, 5 F.3d 230, 234 n.1 (7th Cir. 1993).

Lavoie attempts to attack this clearly established law by citing cases where an officer's use of deadly force against an advancing driver was found reasonable.  <u>See</u> Doc. No. 62 at 16– 17.  But even those Courts of Appeals that have found an

---

that he should not be protected by the shield of qualified immunity"); <u>cf.</u> Cowan, 352 F.3d at 764–65 & n.7 (acknowledging that, in some cases, the questions of constitutional violation and violation of a clearly established right converge).

officer's use of such force to be reasonable implicitly acknowledge that, at some point, a reasonable officer must step aside instead of firing. For instance, in Robinson v. Arrugueta, 415 F.3d 1252 (11th Cir. 2005), the Eleventh Circuit emphasized that an officer confronted with an oncoming vehicle had, at most, 2.72 seconds to react to the vehicle. Id. at 1256. He therefore was entitled to qualified immunity because he had to make "a split-second decision of whether he could escape before he got crushed." Id.; see also Thomas v. Durastanti, 607 F.3d 655, 666 (10th Cir. 2010) (noting officer "had mere seconds to react" to an oncoming vehicle). If an officer has ample time to respond to a potential threat, however, the logic of Robinson does not apply. The same can be said for the rationales underlying similar cases decided by the First and Seventh Circuits after 2013. See McGrath, 757 F.3d at 28 (noting that officer had to make a "split-second judgment" about whether to use deadly force against driver); Tolliver v. City of Chicago, 820 F.3d 237, 246 (7th Cir. 2016) (noting that "officers had only seconds to react to the threat" of an oncoming vehicle). Lavoie's argument only reinforces the clearly established rule. Thus, even on the theory that Lawrence's vehicle was moving toward Lavoie when he fired,

Lavoie would not be entitled to qualified immunity at this stage, and Rand's claim survives.[12]

## B.  **State Law Claim**

In addition to his federal claim under § 1983, Rand seeks damages under state law for Lawrence's wrongful death.  See Doc. No. 19 at 15.  Section 556:12 of the New Hampshire Revised Statutes allows for the administrator of an estate to collect damages resulting from the "injury complained of in [an] action."  Lavoie seeks summary judgment with respect to this claim on grounds of official immunity.[13]  I conclude that official immunity cannot attach at this time.

New Hampshire's official immunity statute provides state officers with immunity against suits "arising from acts

---

[12] Given my resolution of Lavoie's motion for summary judgment on the § 1983 claim, I need not address Rand's argument that an officer may not use deadly force in self-defense where he or she recklessly creates the applicable danger.  See Doc. No. 68-1 at 10.

[13] Lavoie advances two additional arguments, neither of which is persuasive.  First, Lavoie argues that § 556:12 does not provide a cause of action but merely allows for certain damages to be collected in an independent claim.  See Doc. No. 62 at 18.  Even if Lavoie is correct in his interpretation of § 556:12, Rand's complaint plainly provides sufficient facts to support a common-law battery claim, which can serve as the basis for wrongful death damages.  See Doc. No. 19 at 2-3; Restatement (Second) of Torts § 13 (Am. Law Inst. 1965).  Second, Lavoie asserts he is entitled to sovereign immunity.  Doc. No. 62 at 18.  His brief, however, appropriately concedes that sovereign immunity applies only to the state.  See id. at 18-19; see also §§ 99-D:1, 541-B:19.

committed within the scope of their official duty while in the course of their employment for the state and not in a wanton or reckless manner." N.H. Rev. Stat. Ann. § 99-D:1.  When the claims involved are for intentional torts like battery, the New Hampshire Supreme Court has held that officers are entitled to official immunity only if they (1) "subjectively believed that [their] conduct was lawful" and (2) they did not objectively act "recklessly or wantonly as to the lawfulness of their conduct." Farrelly v. City of Concord, 168 N.H. 430, 444-46 (2015).[14]

New Hampshire law permits police officers to use deadly force under only two circumstances.  An officer may use deadly force "when he reasonably believes such force is necessary . . . [t]o defend himself or a third person from what he reasonably believes is the imminent use of deadly force." N.H. Rev. Stat. Ann. § 627:5(II)(a).  Deadly force may also be used "when [the

_____

[14] Farrelly concerned municipal police officers, who are entitled to official immunity through the common law, not § 99-D:1.  See 168 N.H. at 439.  I conclude that the New Hampshire Supreme Court would likely employ the same standards for statutory official immunity as it does for common-law official immunity. See Everitt v. Gen. Elec. Co., 156 N.H. 202, 219 (2007) (basing scope of common-law official immunity on, inter alia, scope of statutory official immunity); Laramie v. Stone, 160 N.H. 419, 437 (2010) (stating official immunity statute "is simply a statement of policy adopting the common law doctrines of sovereign and official immunity"); see also R.N. v. Rogan, 2017 DNH 044, 1, 11 (citing common-law official immunity cases in suit against New Hampshire State Police officer), appealed docketed, No. 17-1267 (1st Cir. Mar. 22, 2017).

officer] reasonably believes such force is necessary . . . [t]o effect an arrest or prevent the escape from custody of a person whom he reasonably believes . . . [h]as committed or is committing a felony involving the use of force or violence, is using a deadly weapon in attempting to escape, or otherwise indicates that he is likely to seriously endanger human life or inflict serious bodily injury unless apprehended without delay." § 627:5(II)(b).

I conclude that summary judgment on the basis of official immunity is not appropriate. Even assuming that Lavoie subjectively believed in the lawfulness of his actions, a jury could conclude that Lavoie acted recklessly or wantonly, if, as specified above, either Lawrence's vehicle did not move after colliding with Lavoie's cruiser or Lawrence's vehicle moved slowly toward Lavoie before he fired.

On the first theory, I must assume that Lawrence's vehicle did not move after colliding with Lavoie's cruiser, because Rand has created a genuine factual dispute on that point. On those facts, Lavoie's decision to shoot Lawrence could be found reckless or wanton. Given what Lavoie knew about Lawrence's preceding conduct, a stationary Lawrence obviously posed no threat of imminent harm to Lavoie or other officers. See § 627:5(II)(a). It was likewise obvious that Lawrence had not committed "a felony involving the use of force or violence," was

not attempting to escape, and posed no threat to others.  See §
627:5(II)(b).

The facts under the second theory yield the same result.
Assuming Lavoie's version of events, viewed in the light most
favorable to Rand, a jury could conclude that Lavoie acted
recklessly or wantonly.  The jury may reasonably determine that,
given the amount of time that Lavoie had to react to Lawrence's
movement, it was clearly not necessary for Lavoie to defend
himself or others with deadly force.  See § 627:5(II)(a); see
also Doc. No. 68-10 at 5-6 (Kirkham opinion).  Moreover, merely
attempting to flee does not constitute a violent felony or
demonstrate that Lawrence posed a threat to others.  See §
627:5(II)(b).  And although vehicles may sometimes represent
deadly weapons, a jury could reason that Lawrence's vehicle was
moving so slowly that it could not be seen as a deadly weapon
employed in Lawrence's escape.  See id.  Thus, under either of
Rand's theories, summary judgment on the state claim is
inappropriate.[15]

_____

[15] At oral argument and in subsequent briefing, Rand asked me to
consider evidence submitted under seal when evaluating Lavoie's
state law immunity claim.  See Doc. No. 142 at 1-2.  Having
reviewed Rand's brief and Lavoie's reply, I find the disputed
evidence to be irrelevant to this order because it is not a
factor in the objective prong of official immunity, and I have
assumed for purposes of analysis that Lavoie subjectively
believed in the lawfulness of his actions.  Therefore, I have
not considered the disputed evidence in deciding Lavoie's motion
for summary judgment.

## IV.  <u>CONCLUSION</u>

For the reasons explained above, I deny Lavoie's motion for summary judgment (Doc. No. 60).

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge


September 5, 2017

cc:  Charles G. Douglas, III, Esq.
     Richard J. Lehmann, Esq.
     Karen A. Schitzer, Esq.
     Matthew T. Broadhead, Esq.
     Rebecca Woodard Ross, Esq.
     Kenneth A. Sansone, Esq.
     Seth Michael Zoracki, Esq.